**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jan 13 2015, 5:55 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**DARREN BEDWELL**
Marion County Public Defender's Office
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KARL M. SCHARNBERG**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| WILLIE HAWKINS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A04-1401-CR-27 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Grant Hawkins, Judge
Cause No. 49G05-1208-FC-57882

**January 13, 2015**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**ROBB, Judge**

Following a jury trial, Willie Hawkins was convicted of corrupt business influence, a Class C felony; burglary, a Class C felony; and twelve counts of theft, all Class D felonies. He raises several issues for review, which we consolidate and restate as: 1) whether the evidence was sufficient to sustain certain convictions; and 2) whether his convictions for burglary (Count 2) and theft (Count 3) of the same property violate the Indiana Double Jeopardy Clause. Concluding the State presented sufficient evidence for the jury to find Hawkins guilty on all challenged counts but that Hawkins's convictions of burglary and theft of the same property violate the Indiana Double Jeopardy Clause, we affirm in part, reverse in part, and remand with instructions for the trial court to vacate Hawkins's conviction of Count 3.

## Facts and Procedural History

Hawkins owned and operated The Budget Property Group ("the Company"). The Company proclaimed it was in the business of renting homes, arranging short sales for homes in foreclosure, and repairing credit. The Company advertised its services by placing signs in the yards of vacant homes that stated "rent-to-buy." However, Hawkins operated a general scheme through the Company, where he would find vacant homes; purport to have authority to sell the home; convince aspiring home owners to sign a rent-to-buy agreement; offer to repair the person's credit so they could obtain financing; and require a deposit which was promised to go towards the home's purchase price.

Wayne Shelton, a detective assigned to the Marion County Prosecutor's Office grand jury division, was contacted by a HUD agent and advised to investigate Hawkins's

business practices. Shelton's investigation revealed several instances of criminal conduct by Hawkins, and the State charged Hawkins accordingly. In total, nineteen counts proceeded to the jury. The jury found Hawkins guilty of fourteen counts, including the following at issue on appeal: corrupt business influence (Count 1); theft of Patrick McKee's home (Count 15); theft of Anarose Clay's currency (Count 6); theft of Ronnie Balay's currency (Count 7); theft of Patsy Skelton's currency (Count 19); and burglary and theft of Terri Miller's home (Counts 2 and 3, respectively).[1] With respect to the corrupt business influence charge, the State alleged twelve acts of theft to show Hawkins engaged in a pattern of racketeering activity, of which the jury specifically found Hawkins engaged in Act 2—unauthorized control of Terri Miller's home—and Act 11—unauthorized control of Patrick McKee's home. Hawkins now appeals. Additional facts will be provided as necessary.

Discussion and Decision

I. Sufficiency of Evidence

A. Standard of Review

"When reviewing the sufficiency of the evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict." Oster v. State, 992 N.E.2d 871, 875 (Ind. Ct. App. 2013), trans. denied. We will not reweigh evidence or assess credibility of the witnesses. Glenn v. State, 999 N.E.2d 859, 861 (Ind. Ct. App. 2013). "The conviction will be affirmed unless no reasonable fact-

---

[1] He was also found guilty of seven additional counts of theft.

3

finder could find the elements of the crime proven beyond a reasonable doubt." Id. (citation and quotation marks omitted).

## B. Corrupt Business Influence

### 1. Pattern of Racketeering Activity

In order to convict Hawkins of corrupt business influence as charged, the State had to show Hawkins was "employed by or associated with an enterprise, and [he] knowingly or intentionally conduct[ed] or otherwise participate[d] in the activities of that enterprise through a pattern of racketeering activity." Ind. Code § 35-45-6-2(3); see also Appellant's Appendix at 279. A "[p]attern of racketeering activity means engaging in at least two (2) incidents of racketeering activity that have the same or similar intent, result, accomplice, victim, or method of commission . . . ." Ind. Code § 35-45-6-1(d) (quotation marks omitted).

At trial, the State alleged twelve acts of theft to show a pattern of racketeering activity and Hawkins was convicted of corrupt business influence after the jury found him guilty of two specific acts of racketeering: Act 2, theft of Miller's home, and Act 11, theft of McKee's home. In order to prove each of these acts of theft, the State had to prove Hawkins "knowingly or intentionally exert[ed] unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use . . . ." Ind. Code § 35-43-4-2(a). For purposes of the theft statute, "exert control over property" means "to obtain, take, carry, drive, lead away, conceal, abandon, sell, convey, encumber, or possess property, or to secure, transfer, or extend a right to property." Ind. Code § 35-43-4-1(a).

4

On appeal, Hawkins challenges his conviction of corrupt business influence only on the grounds that the evidence was insufficient to show he committed Act 11—theft of McKee's home. However, because Hawkins was also convicted independently of theft of McKee's home, he challenges his convictions of both corrupt business influence and theft of McKee's home (Count 15) under the same theory. Thus, Hawkins convictions of both corrupt business influence and theft of McKee's home depend on whether there was sufficient evidence to sustain his conviction of theft of McKee's home.

2. Theft of Patrick McKee's Home

Hawkins claims there was insufficient evidence to show he committed theft of McKee's home, because no direct evidence existed to show he exerted control over the home. However, "[c]ircumstantial evidence will be deemed sufficient [to sustain a conviction] if inferences may reasonably be drawn that enable the trier of fact to find the defendant guilty beyond a reasonable doubt." Pierce v. State, 761 N.E.2d 821, 826 (Ind. 2002). Our review reveals an overwhelming amount of circumstantial evidence.

McKee and his wife owned the home at 11457 High Timber Drive. They had a mortgage on the property, and because they were falling behind on payments, they decided to work with the bank and sell the property. They moved out of the home in case foreclosure became necessary. However, McKee continued to check on his home. At some point, McKee received a phone call from Hawkins. Hawkins said he "could help [him] out with selling it and possibly doing a bankruptcy." Transcript at 617. Hawkins said he wanted to buy the home. McKee and Hawkins began discussing a contract;

5

however, McKee did not agree with the terms of the contract Hawkins offered. No contract was signed, and McKee did not give any house keys to Hawkins.

A few weeks later, McKee checked on the home and discovered the locks had been changed, and the electricity in the home had been turned back on. He contacted the bank, and it had neither changed the locks nor sold the home. McKee discovered that people were living in the home, so he contacted Hawkins. Hawkins told McKee that he "put his sister in the house." Tr. at 620. McKee told Hawkins that he did not have permission to do that. McKee then knocked on the door to the home and met two individuals who said they knew Willie Hawkins.

The evidence presented at trial shows Hawkins knew McKee's home was vacant, and Hawkins was interested in buying it. Just weeks after McKee rejected Hawkins's contract proposal, McKee discovered people living in the home, the locks on the home had been changed, and the electricity had been turned back on. When confronted by McKee, Hawkins admitted that he "put his sister in the house." Id. Moreover, the people living in the home told McKee they knew Hawkins. Under these circumstances, it is reasonable to infer that Hawkins—without authority from the bank or McKee—obtained access to the home, secured the home, and facilitated the move in of his sister. There was sufficient evidence to show Hawkins exerted unauthorized control over McKee's property, and therefore, the evidence was sufficient to show Hawkins committed theft and also to prove an act of racketeering activity. Because Hawkins did not challenge the evidence supporting the racketeering activity alleged in Act 2, the evidence is sufficient to show Hawkins

6

participated in a pattern of racketeering activity and committed corrupt business influence. Accordingly, Hawkins's convictions of Count 1 and Count 15 are affirmed.

## C. Hawkins's Additional Theft Convictions

To convict Hawkins of theft, the State had to prove he knowingly or intentionally exerted unauthorized control over another person's property. See Ind. Code § 35-43-4-2(a). Hawkins exerted control over another person's property if he took the property, obtained the property, or possessed the property, see Ind. Code § 35-43-4-1(a), and it was "unauthorized" if it was exerted by transferring property while failing to disclose a legal impediment to the enjoyment of that property, by creating a false impression, or by promising performance that he knew would not be performed, see Ind. Code § 35-43-4-1(b).

### 1. Anarose Clay's Currency

Hawkins was convicted of theft of Anarose Clay's currency. Hawkins now contends there is insufficient evidence to sustain his conviction, because there is no evidence showing he exerted unauthorized control over Clay's money.

Clay, looking for a home, contacted Hawkins. He informed Clay of several properties, and after one of the Company's employees showed her the home at 11051 Falls Church Drive, Clay became interested. Hawkins told Clay that "he bought the house from the owners" and that "he was reselling because it was under foreclosure." Tr. at 487. Clay signed a purchase agreement, agreeing to purchase the home for $115,000 and paid Hawkins $1,500 as a down payment. Hawkins gave Clay a home buyer's certificate, which stated she "bought property from him." Id. at 474. Nonetheless, Hawkins told Clay he

would need to fix her credit and it would take up to a year for her to purchase the home. Accordingly, the agreement was a rent-to-own arrangement whereby Clay would pay him $700 per month in rent until her credit improved. These payments were supposed to go towards the purchase price of the home. Clay paid Hawkins $700 a month until the true "owners came knocking on [her] door." Id. at 482.

Clay stopped paying Hawkins when she learned that he did not own the home. "[H]e wasn't happy about that." Id. at 484. He said she "shouldn't talk to the [owners]." Id. Clay moved out of the home about a month later and would have never signed the contract with Hawkins if she knew he was not authorized to sell the home.

Hawkins's control over Clay's money was unauthorized if it was exerted by promising performance that he knew would not be performed. See Ind. Code § 35-43-4-1(b)(6). Hawkins told Clay that "he bought the house from the owners" and that "he was reselling because it was under foreclosure." Tr. at 487. Clay paid Hawkins $1,500 as a down payment and made several $700 payments, all of which were supposed to go towards the purchase price of the home. Hawkins gave Clay a home buyer's certificate, which stated she "bought property from him." Id. at 474. Hawkins did all of this without any rights in the property or authority to sell the home. Accordingly, the evidence is sufficient to show Hawkins exerted unauthorized control over Clay's money.

### 2. Ronnie Balay's Currency

Hawkins was convicted of theft of Ronnie Balay's currency. Hawkins now contends there is insufficient evidence to sustain his conviction, because there is no evidence showing he exerted unauthorized control over Balay's money.

Ronnie Balay and her husband saw a rent-to-buy sign at the intersection of 30th Street and Pawnee Drive. She called the number listed on the sign and talked to Devin Davis, Hawkins's business partner. Balay met with Davis a few weeks later to look at the home at 2816 Pawnee Drive. Although Balay did not go inside, she liked it. Accordingly, a meeting with Hawkins was set up. Balay met Hawkins at the home, but because Hawkins did not have the keys, they entered through a broken garage door.

Balay liked what she saw and made a $1,500 deposit on the home. However, Hawkins never gave her the keys. Balay was told to enter the home through the garage and change the locks. Because the home was dirty, Hawkins let Balay clean the home in lieu of paying the first month's rent. After living in the home about a month, Balay signed a contract, agreeing to pay Hawkins rent until her credit was good enough to buy the home. The parties verbally agreed to a purchase price of $70,000 for the home. Balay made twelve payments of $700 to Hawkins, amounts he said would go towards the purchase price of the home.

Balay stopped paying Hawkins when she found an eviction notice on her door. The house had been sold at a sheriff's sale. When confronted, Hawkins told Balay that the house "hadn't actually sold at a sheriff's sale." Id. at 233. He told her to "do nothing." Id. Balay called the new owners and started renting the home from them. Balay never got the chance to purchase the home, and Hawkins never returned her money.

Hawkins purported to have authority to access and sell the home at 2816 Pawnee Drive. In doing so, he collected a $1,500 down payment and twelve $700 monthly payments, all of which were supposed to go towards the purchase price of the home. By

deception, Hawkins promised Balay performance that he could not perform. Accordingly, the evidence was sufficient to show Hawkins exerted unauthorized control over Balay's money.

### 3. Patsy Skelton's Currency

Hawkins was convicted of theft of Patsy Skelton's currency. Hawkins now contends there is insufficient evidence to sustain his conviction, because there is no evidence showing he exerted unauthorized control over Skelton's money.

Patsy Skelton and her husband wanted to buy a new home. While looking for a home, Skelton saw a sign, called the number listed on the sign, and talked to Hawkins. They set up a meeting, at which Hawkins reviewed all three of the Skeltons' credit reports, and the Skeltons informed Hawkins of all of their bills. One of the credit reports listed a $5,000 judgment against the Skeltons. Hawkins agreed to fix the Skeltons' credit for $300. Although Skelton did not have a specific home in mind, she signed a contract and paid Hawkins $1,200 as a down payment for a home. Hawkins told her to find "any house that had a for rent to buy sig[n]." Id. at 398.

Skelton found a home she liked at 1382 Westminster Court. Hawkins showed Skelton the home. Although he had permission to secure the property, Hawkins did not have permission to rent, sell, or enter the home; the owner of the home never gave him the keys. After seeing the home, Skelton asked Hawkins how she could get it, and he said she and her husband needed "to fix things on [their] credit." Id. at 403. At some point, Hawkins talked with Mr. Skelton about obtaining a VA loan to purchase the home. However, Hawkins could not contact anyone at the VA and could never get the keys.

10

Hawkins then told the Skeltons that they could not get the home, because of a $5,000 judgment on their credit report. Skelton never had the chance to purchase a home, and Hawkins failed to return Skelton's down payment.

Hawkins collected a $1,200 down payment from Skelton, and it was supposed to go towards the purchase price of a home. Hawkins took Skelton's money even though he reviewed all three credit reports in advance. He then showed the Skeltons a home which he had no authority to sell. After the Skeltons decided they liked that home, Hawkins told the Skeltons that a $5,000 judgment showed up on their credit report. Although Skelton never purchased a home, Hawkins never returned her deposit. On these facts, the evidence was sufficient to show Hawkins exerted unauthorized control over Skelton's money.

In conclusion, the State presented sufficient evidence to show Hawkins exerted unauthorized control over Clay's, Balay's, and Skelton's money by promising to sell them homes that he knew he had no right to sell. His convictions of theft as to each of them is affirmed.

## II. Indiana Double Jeopardy Clause

Hawkins was convicted of burglary and theft of Terri Miller's home. He now contends his burglary conviction (Count 2) and his theft conviction (Count 3) violate the Double Jeopardy Clause in Article 1, Section 14 of the Indiana Constitution.

### A. Standard of Review

Whether a conviction violates the principles of double jeopardy is a question of law which this court reviews de novo. Calvert v. State, 14 N.E.3d 818, 822 (Ind. Ct. App. 2014). "[T]wo or more offenses are the same offense in violation of Article I, Section 14

11

of the Indiana Constitution, if, with respect to <u>either</u> the statutory elements of the challenged crimes <u>or</u> the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." <u>Richardson v. State</u>, 717 N.E.2d 32, 49 (Ind. 1999) (quotation marks omitted) (emphasis in original). "[I]n order to find a double-jeopardy violation pursuant to the <u>Richardson</u> actual evidence test, we must conclude there is a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense." <u>Garrett v. State</u>, 992 N.E.2d 710, 722-23 (Ind. 2013) (citation and quotation marks omitted). Under the actual evidence test, there is no violation "when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense." <u>Id.</u> at 719 (citation omitted).

### B. Hawkins's Burglary and Theft Convictions

Hawkins claims and the State concedes that his burglary and theft convictions violate the Double Jeopardy Clause in Article 1, Section 14 of the Indiana Constitution, because both convictions are based on the same actual evidence.

The State's evidence showed that Jeffrey and Terri Miller owned the house at 11420 Louden Lane. However, the Millers divorced and only Terri Miller lived in the home. She was attempting to sell it. Due to financial difficulty, she filed bankruptcy in April 2011. Working with Wells Fargo, Terri moved out of the home in June 2011, and the foreclosure process began. Terri did not intend on keeping the home; however, she left some personal

12

items behind and continued to check on the home periodically. In August 2011, she stopped by the house to "get some things" and noticed a rent sign placed in the front yard. Tr. at 86. Terri called the phone number listed on the sign but had to leave a message. She then called Wells Fargo and the law firm representing it in the foreclosure process. Before leaving the home, Terri ensured it was secure.

Terri checked on the home again in December 2011. She noticed a chair sitting on the front porch and curtains hanging in the window. There was also mail in the mailbox addressed to someone with the last name Hawkins. Terri learned that a woman was living in the home and told the woman that it had not yet been sold.

Shortly after speaking with the woman, Terri received a phone call from Willie Hawkins. She had never before spoken with him; however, Hawkins expressed interest in purchasing the home at a sheriff's sale. He also told Terri that his sister was going through a difficult time, and "he had moved in on the home too soon." Id. at 92. He had "made a bad business decision." Id. Terri told Hawkins that he was unauthorized to be in the home.

Based on this evidence, the State charged Hawkins with burglary and theft of Terri Miller's home. The State's charging information for burglary (Count 2) stated:

> In or about December 2011, Willie J. Hawkins, Jr., did break and enter the building or structure, that is: 11420 Louden Lane, or another person, that is: Terri and/or Jeffrey Miller, with the intent to commit the felony of Theft therein; that is, with the intent to knowingly exert unauthorized control over the property of Terri and/or Jeffrey Miller, with intent to deprive Terri and/or Jeffrey Miller of any part of its value of use.

Appellant's Appendix at 105. Similarly, theft (Count 3) stated:

> In or about December 2011, Willie J. Hawkins, Jr., knowingly exerted unauthorized control over the property, that is, 11420 Louden Lane, or Terri

13

and/or Jeffrey Miller, with the intent to deprive Terri and/or Jeffrey Miller any part of its value or use, and the fair market value of such property was over $100,000.

Id. However, with respect to Count 3, the State submitted jury instructions for Class D felony theft, which omitted the State's need to prove the value of the property as stated in the original charge. Id. at 181.

Additionally, the State made the following argument to the jury regarding the burglary and theft of Terri Miller's home:

> Burglary requires breaking and entering [sic] gaining unauthorized access to a person's residence, by breaking and entering for the purpose of committing a crime inside. And the crime here is theft and it's actually theft of the house, it's theft of the house itself, not stuff in the house, the house. He took the house from Terri Miller and Jeffrey Miller. They didn't have access to it while someone else was living in it. He took their house. So this one is a little bit different. It's both the burglary of a house and then the theft of the house itself from Terri, from Jeffrey.

Tr. at 850-51. Considering the fact that the State did not distinguish between the evidence used to support each conviction, we conclude there is a reasonable possibility that the evidentiary facts used by the jury to establish the essential elements of burglary may also have been used to establish the essential elements of theft. See Garrett, 992 N.E.2d at 722-23. This violates the actual evidence prong of our double jeopardy analysis, and therefore, both convictions cannot stand. Accordingly, we reverse and remand with instructions for the trial court to vacate Hawkins's conviction of Count 3.[2]

---

[2] As an alternative argument, Hawkins also asked this court to order the trial court to correct an error on his abstract of judgment. Namely, Hawkins has pointed out that his conviction of Count 3 is listed as a Class C felony but should be listed as a Class D felony per the State's jury instructions. Since his conviction of Count 3 will be vacated, this issue is now moot.

14

## Conclusion

Concluding there was sufficient evidence to support Hawkins's corrupt business influence and challenged theft convictions, we affirm those convictions. Concluding that Hawkins's convictions of both burglary (Count 2) and theft (Count 3) of Miller's home violate Article 1, Section 14 of the Indiana Constitution, we reverse and remand with instructions for the trial court to vacate Hawkins's conviction of theft (Count 3).

Affirmed in part, reversed in part, and remanded.

BAKER, J., and KIRSCH, J., concur.